# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**VICTORIA LYNN SISSON, Administrator**
**of the Estate of JASON PATRICK SISSON, Deceased,**

                    **Plaintiff,**

**v.**                                        **Civil Action No.   3:19cv602**

**PIEDMONT REGIONAL JAIL AUTHORITY**
          **Serve: Mr. James W. Garnett, Jr., Chairman**
                    **5368 Lockett Road**
                    **Rice, Virginia 23966**

**JAMES H. DAVIS**
**409 Fourth Avenue**
**Farmville, Virginia 23901**

**AMY BAKER a/k/a AMY REID**
**931 Fairgrounds Road**
**Farmville, Virginia 23901**

**NATHANIEL C. JONES, JR.**
**3520 Rocky Ford Road**
**Crewe, Virginia 23930**

**DAVID HICKS**
**801 Industrial Park Road**
**Farmville, Virginia 23901**

**MEDIKO, INC.**
          **Serve: G. Wythe Michael, Esquire (Registered Agent)**
                    **Goodman Allen Donnelly, PLLC**
                    **4501 Highwoods Parkway, Suite 210**
                    **Glen Allen, Virginia 23060**

**MEDIKO, P.C.**
          **Serve: G. Wythe Michael, Esquire (Registered Agent)**
                    **Goodman Allen Donnelly, PLLC**
                    **4501 Highwoods Parkway, Suite 210**
                    **Glen Allen, Virginia 23060**

**ABRAHAM TEKLU, M.D.**
**14218 Riverdowns South Drive**
**Midlothian, Virginia 22311**

**ELIZABETH A. SMITH**
**1630 Cumberland Road**
**Farmville, Virginia 23901**

**KASKHA N. JOHNSON**
**631 Hickory Road**
**Kenbridge, Virginia 23944,**

**Defendants.**

## COMPLAINT

COMES NOW Plaintiff Victoria Lynn Sisson, Administrator of the Estate of Jason Patrick

Sisson, Deceased ("Plaintiff"), by counsel, and states as follows for her Complaint against

Defendants Piedmont Regional Jail Authority, James H. Davis, Amy Baker a/k/a Amy Reid,

Nathaniel C. Jones, Jr., David Hicks, Mediko, Inc., Mediko, P.C., Abraham Teklu, M.D., Elizabeth

A. Smith, and Kaskha N. Johnson, all named as defendants herein (collectively "Defendants"):

## INTRODUCTORY STATEMENT

This case arises as a direct and proximate result of the long, sordid, and well-documented

history of constitutionally inadequate health care rendered to inmates at the Piedmont Regional Jail

in Farmville, Virginia. As detailed herein, the death of Jason Patrick Sisson is yet another chapter in

that history.

## NATURE OF ACTION

1.      This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking damages against

Defendants for acts committed under the color and authority of state law, which deprived decedent

Jason Patrick Sisson ("Sisson") of rights secured under the Constitution and laws of the United

States of America.

2

2.      In addition, this action seeks damages against Defendants pursuant to Va. Code §§ 8.01-50 et seq. for Sisson's wrongful death, proximately caused by Defendants' common law negligence, gross negligence, and/or willful and wanton negligence.

## JURISDICTION AND VENUE

3.      Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1343.

4.       This Court has pendent and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because the events underlying this action occurred within the jurisdiction of the United States District Court for the Eastern District of Virginia, Richmond Division.

## THE PARTIES

6.      Plaintiff Victoria Lynn Sisson is a Virginia resident who qualified as Administrator of Sisson's Estate on September 13, 2017.  Sisson died on August 21, 2017, at the Medical College of Virginia in Richmond, Virginia, at the age of 34.  Prior to his death, Sisson had been an inmate at the Piedmont Regional Jail ("PRJ" or "Jail") in Farmville, Virginia, a town in Prince Edward County, Virginia.  Prior to being incarcerated, Sisson had been a resident of Culpeper County, Virginia.  Copies of Sisson's death certificate and Plaintiff's Certificate/Letter of Qualification are attached as Exhibits A and B, respectively, and are incorporated herein by reference.  Victoria Lynn Sisson brings this matter in her capacity as Administrator of Sisson's Estate.

7.      Sisson's statutory beneficiary under the Wrongful Death Act, Va. Code §§ 8.01-50 et seq., is his minor son C.C.

3

8.    At all times relevant herein, the Jail was a regional jail owned and operated by Defendant Piedmont Regional Jail Authority ("PRJA"), a regional jail authority created by the counties of Amelia, Buckingham, Cumberland, Lunenberg, Nottoway, and Prince Edward pursuant to Va. Code §§ 53.1-95.2 et seq. to manage the Jail.

9.    The PRJA is not an arm or agency of the Commonwealth of Virginia, and was not an arm or agency of the Commonwealth of Virginia at any time relevant herein.

10.    The actual creation of the PRJA required local activation by one or more counties or municipalities.

11.    The PRJA was neither created as a body corporate and politic and as a political subdivision of the Commonwealth of Virginia, nor was it a body corporate and politic and political subdivision of the Commonwealth of Virginia at any times relevant herein.

12.    Presently and at all times relevant herein, the PRJA lacked the power of eminent domain.

13.    Presently and at all times relevant herein, the Board of the PRJA included at least one unelected citizen member.

14.    Presently and at all times relevant herein, the PRJA was authorized and empowered to sue and be sued in its own name, plead and be impleaded, by virtue of Va. Code § 53.1-95.7.

15.    At all times relevant herein, neither the PRJA nor any of its employees, agents, and/or servants were protected by the doctrine of state law sovereign immunity.

16.    Defendant James H. Davis ("Davis") is the current Superintendent of the PRJA. At all times relevant herein, Davis was the Director of Compliance/Accreditation at the PRJA, was an employee, agent, and/or servant of the PRJA, acting within the course and scope of his employment, agency, and/or service with the PRJA, and under the color of state law. Davis, along with former

4

Superintendent Donald Hunter, operated and managed the Jail and directed and supervised its personnel.  Among his duties, Davis was the point person at the Jail with specific responsibility for trying to address the historical, endemic problems with inmate health care, for obtaining or reobtaining the Jail's accreditation and certification, and for the PRJA's efforts to bring the Jail into compliance with the terms of the Consent Decree entered in United States v. Piedmont Reg'l Jail Auth., Civil No. 3:13-cv-646-REP (U.S. District Court for the Eastern District of Virginia).  Consistent with those duties and responsibilities, Davis had plenary authority to make changes to PRJA policies and procedures.  Davis is sued in his individual and official capacity.

17.     Defendant Amy Baker a/k/a Amy Reid ("Baker") was at all times relevant herein a correctional officer holding the rank of Sergeant, and an employee, agent, and/or servant of the PRJA, and acting within the course and scope of her employment, agency, and/or service with the PRJA, and under the color of state law.  At all times relevant herein, Baker was a correctional officer assigned to the Jail, and in such capacity was responsible for the safety, security, health, and welfare of inmates at the Jail, including Sisson.  Baker is sued in her individual capacity.

18.     Defendant Nathaniel C. Jones, Jr. ("Jones") was at all times relevant herein a correctional officer and an employee, agent, and/or servant of the PRJA, and acting within the course and scope of his employment, agency, and/or service with the PRJA, and under the color of state law.  At all times relevant herein, Jones was a correctional officer assigned to the Jail and in such capacity was responsible for the safety, security, health, and welfare of inmates at the Jail, including Sisson.  Jones is sued in his individual capacity.

19.     Defendant David Hicks ("Hicks") was at all times relevant herein a correctional officer and an employee, agent, and/or servant of the PRJA, and acting within the course and scope of his employment, agency, and/or service with the PRJA, and under the color of state law.  At all

5

times relevant herein, Jones was a correctional officer assigned to the Jail and in such capacity was responsible for the safety, security, health, and welfare of inmates at the Jail, including Sisson. Jones is sued in his individual capacity.

20.     Records indicate that, in addition to certain named Defendants as described herein, there were others employed by the PRJA, including but not limited to Janee Shuford, Earl Townsend, Jacob Wood and unidentified correctional officers and PRJA employees, agents, and/or servants who had care, custody, and/or control over Sisson during his incarceration.  At all relevant times, the foregoing employees, agents, and/or servants of the PRJA were acting within the scope of their employment, agency, and/or service with the PRJA.  Plaintiff's state-law claims against the PRJA include the actions and/or inactions of these individuals as well as any other PRJA employee, agent, and/or servant who disregarded the medical needs of Sisson.

21.     Defendant Mediko, Inc. is and was at all times relevant herein a Virginia corporation with its principal place of business in Henrico County, Virginia.  Defendant Mediko, P.C. is and was at all relevant times herein a Virginia corporation with its principal place of business in Henrico County, Virginia.  According to the Virginia State Corporation Commission, Mediko P.C. may be merely the old name of Mediko, Inc.  Both Defendants Mediko, Inc. and Mediko, P.C. are referred to collectively herein as "Mediko."

22.     At all times relevant herein, Mediko had a contract with the PRJA.  By contract, Mediko assumed responsibility for the provision of on-site health care services to all inmates and detainees at the PRJ, including Sisson, and also for supervising, directing, and controlling health care personnel at the Jail.  In particular, Mediko was paid in excess of $1,200,000 per year to provide healthcare services at the Jail.  In submitting its bid to become the on-site health care provider at Jail, Kaveh Ofogh, M.D., President of Mediko, wrote to the Jail on July 29, 2013:

6

"Additionally, after careful review of the **Settlement Agreement with the United States**

**Department of Justice**, MEDIKO is confident in providing quality care to ensure inmates at the

Piedmont Regional Jail are covered with mandated constitutional medical and mental health care. . .

MEDIKO thrives on success, and after reviewing the severity of the Settlement Agreement put forth

by the United States Department of Justice; MEDIKO will make every effort to provide

knowledgeable and Correctional experienced professionals to provide health care services and

address all medical and mental health concerns." (emphasis in original).

a. In its contract with the PRJA, Mediko made the following promises:

   i. Examination and treatment of inmates referred in accordance with approved protocols;
   ii. Review of all laboratory and medical consultation results; and assure appropriate intervention is implemented; when indicated;
   iii. Fulfilling health care related requests by the medical staff;
   iv. Complete review of inmate medical records received from outside agencies;
   v. A process for reviewing all daily sick-call logs and nurse's notes to monitor compliance with protocols and other appropriate medical standards;
   vi. Complete physical examination of inmates designated to participate in state or local special correctional programs; and
   vii. Review of inmate health appraisals conducted by RN.

b. Mediko also promised in its contract with the PRJA that it would create and adopt policies and procedures based on applicable State and Federal laws and regulations, Board of Corrections policies and regulations, ACA standards, NCCHC standards, PREA standards and DOC directives and operating procedures.

c. In its contract with the PRJA, Mediko also promised that it would provide inmate medical and mental health screening *within two to four hours of arrival to ensure that emergent and urgent health needs are met*:

**Receiving Screening**

The intake medical and mental health screening will be performed on all inmates within two to four hours of arrival to ensure that emergent and urgent health needs are met. All intake screening examinations will be performed by a Licensed Practical Nurse or Registered Nurse. All Chronic conditions will be documented on the Problem List for further evaluation and treatment by the health care provider.

The screening includes:

1. current and past illnesses, health conditions or special health requirements to include PPD administration

2. past or current serious infectious disease

3. recent communicable illness symptoms

4. past or current mental illness, including hospitalizations

5. history of or current suicidal ideation

6. dental problems

7. Medications taken and special health (including dietary) requirements

8. allergies

9. legal and illegal drug use (needle sharing, type of drugs, date and time of last drug use), alcohol usage,

10. Alcohol and Opiates withdrawal symptoms

d.    In its contract with PRJA, Mediko also promised that all inmates would have 24/7 access to emergency medical care.

e.    In its contract with the PRJA, Mediko promised to provide a "continuity of care during incarceration" to "ensure that all inmates receive prescribed treatment and diagnostic tests while incarcerated."

23.    Defendant Abraham Teklu, M.D. ("Teklu") is and was at all times relevant herein a physician licensed in the Commonwealth of Virginia. At all times relevant herein, Teklu was a Mediko employee, agent, and/or servant, acting within the course and scope of his employment, agency, and/or service with Mediko, and under color of state law. Teklu was the "Medical Director" at the Jail. As Medical Director at the Jail, Teklu assumed responsibility for the provision of on-site medical services to all Jail detainees and inmates, including Sisson, and also for the supervision, direction, and control of health care personnel at the Jail. Additionally, upon information and belief, as Medical Director of the Jail, Teklu was responsible for implementing

8

medical protocols, as well as for the training, duties, and actions of the medical services staff at the Jail.  Teklu is sued in his individual and official capacities.

24.    Defendant Elizabeth A. Smith ("Smith") is and was at all times relevant herein a registered nurse licensed in the Commonwealth of Virginia.  At all times relevant herein, Smith was the Health Services Administrator ("HSA") at the PRJ, a Mediko employee, agent, and/or servant, acting within the course and scope of her employment, agency, and/or service with Mediko, and under color of state law.  As the HSA during Sisson's incarceration, Smith was charged with planning, directing, and coordinating medical and mental health services at the Jail.  According to Mediko's contract with PRJA, as the HSA, Smith was charged with certain duties:

   a.    The HSA is responsible for ensuring that all levels of care are provided to the inmates.  He/she will be responsible for availability and monitoring of health care services.

   b.    The HSA is responsible for quality management and the timely delivery of health services.

   c.    The HSA is responsible for the coordination of administrative decisions and utilization management to ensure effective and efficient inmate's health care.

   d.    The HSA will ensure that all diagnostic tests and specialty consults are completed in a timely manner and evidence of documentation of the ordering provider's review of results.

   e.    The HSA ensures that results are review with inmates in a timely manner.

   f.    The HSA ensures that off-site referrals and emergency orders are reviewed by the on-site provider for continuity of care.

   g.    The HSA will ensure that inmates receive health services in keeping with community standards as ordered by health care providers.

Smith is sued in her individual and official capacities.

25.    Defendant Kaskha Johnson ("Johnson") is and was at all times relevant herein a licensed practical nurse licensed in the Commonwealth of Virginia.  At all times relevant herein,

Johnson was a Mediko employee, agent, and/or servant acting within the scope of her employment, agency, and/or service with Mediko, and under color of state law.  At all times relevant herein, Johnson was a nurse assigned to the Jail's medical staff and in such capacity was assigned to patient care for all inmates at the Jail, including Sisson.  Johnson is sued in her individual capacity.

26.    Defendants Mediko, Teklu, Smith, and Johnson are collectively referred to herein as the "Mediko Defendants."  The Mediko Defendants had specific responsibilities and duties to provide medical and nursing care to Jail inmates and detainees, including Sisson.

27.    Records indicate that, in addition to certain named Defendants as described herein, there were others employed by Mediko, including but not limited to Chainue Anumudu, M.D., Seretha Bates, LPN, Tyra Bowman, RN, Jamie Smith, Joanna Scott, and Tamika Mitchell, as employees, nurses, or other medical professionals working at Mediko or the Jail during Sisson's incarceration.  At all relevant times, the foregoing employees, nurses, or other medical professionals were employees, agents, and/or servants of Mediko acting within the scope of their employment, agency, and/or service with Mediko.  Plaintiff's state-law claims against Defendant Mediko include the actions and/or inactions of the foregoing employees, as well as the actions and/or inactions of the Mediko Defendants, and any other Mediko employee who disregarded the medical needs of Sisson.

## THE JAIL'S NEGLECT OF SISSON[1]

28.    On January 25, 2017, in the Circuit Court of Culpeper County, Virginia, Sisson was convicted of possessing a Schedule I/II controlled substance in violation of Va. Code § 18.2-

---

[1] The allegations as set forth in the Complaint are based upon information Plaintiff's counsel has been able to gather informally, whether by way of investigation or Freedom of Information Act ("FOIA") request.  The Jail and Virginia State Police continue to withhold voluminous information and videotapes from production to Plaintiff.

250.

29.    Sisson was an inmate at the Jail since on or about June 8, 2017, following a voluntary surrender to custody to facilitate a presentence evaluation for detention and diversion.

30.    On July 5, 2017, Sisson was sentenced to confinement for a term of ten years with all but nine months suspended.  Following sentencing, Sisson was transported back to the Jail to serve the remainder of his active sentence.

31.    On August 12, 2017, Sisson was assaulted by another inmate resulting in a head injury.

32.    Following the assault, Sisson was transported to Centra Southside Community Hospital ("CSCH") where he was diagnosed with a basilar skull fracture with intracranial injury. Sisson was transferred to the Medical College of Virginia ("MCV") for more acute trauma care.

33.    Sisson was admitted at MCV where he remained hospitalized until August 18, 2017.  During that time, Sisson received multiple diagnostic tests which indicated fractures bilaterally of the temporal bone, which involvement included both inner and outer ear structures bilaterally resulting in permanent hearing impairment.  Fractures were also noted bilaterally on the occipital bone at the posterior margin of the condyles.  In addition to the bone fractures, there were significant impairments with vascular structures around the sites of the fractures.  It was noted upon admission that there were thromboses (blood clots) in the intracranial venous system, a fusiform aneurysmal dilatation in the intracranial segment of the left vertebral artery with the possibility of this being a dissecting aneurysm.

11

## August 18, 2017

34.     Sisson was discharged from MCV and back to the care, custody, and control of

the Jail on August 18, 2017.  Sisson's diagnosis upon discharge included bilateral temporal bone

fractures, for which he was ordered and prescribed, among other things:

      a.      An order that he ambulate only with a wheelchair;

      b.      *An order that Sisson be under close observation for 48 hours, and receive medical care in the event of any problems*;

      c.      *An order that he keep his head elevated while lying down*;

      d.      An order that Sisson receive medical care if his symptoms got worse (or did not go away as expected), *if he developed new symptoms, was not acting normally, or had confusion*;

      e.      A prohibition against lifting more than 10 pounds for 14 days;

      f.      A tapering dose of prednisone; and

      g.      A prescription for, among other things, enoxaprin 80 mg to be given every 12 hours until his INR reached a therapeutic level of 2-3, and then warfarin 5 mg daily to maintain an INR of 2-3.[2]

35.     These orders were directly communicated to the Defendants on August 18, 2017

at 10:50 a.m., as evidenced by the following entry in Sisson's Jail medical records:

| Date | Note | Name | | |
|---|---|---|---|---|
| 08-18-2017 8:42 am | notified by the nusrsing staff pt s/p altercation with thrombosis currently on no anticoagulation, will start meds and reevaluate in 3 days | Ashrafi, Dariush | Medical Staff | Medical Note |
| 08-18-2017 10:50 am | Per Dr. Chainue Anumudu the patient is being discharged today back to PRJ. The CTA performed shows a sinus thrombosis. He is being placed on warfarin 5 mg PO daily. Pt and INR needs to be performed weekly. He will need a wheelchair and walker. He is deaf bilaterally and has an appointment for 6 weeks. Reports given to the Superintendent, Majors, Dr. Teklu and Nursing staff. | Smith, Elizabeth | Medical Staff | Misc. Note |
| 08-18-2017 1:25 pm | Received report from MCV that inmate will be discharged and is returning to PRJ today;alert and oriented x3;deaf;skull fx without treatment;patch to right eye;has F/U appointment scheduled; prescription for blood thinner and tapering dose of prednisone;will be returning via jail van. | Woodson, T | Medical Staff | Misc. Note |
| 08-18-2017 3:12 pm | I was informed by E. Smith, RN/HSA that patient is returning from VCU and will require a Walker and a Wheelchair. I called West Home Health care to price items. Approval request forwarded to Culpeper Adult Detention Center for Walker and Wheelchair. If Approved E. Smith, RN/HSA will be notified. JS | Scott, JoAnna | Medical Staff | Medical Note |

---

[2] The International Normalized Ratio ("INR") is a way of reporting the prothrombin time, which is a measure of the blood's ability to coagulate.  In healthy people, an INR of 1.1 or below is considered normal.  An INR range of 2.0 to 3.0 is generally an effective therapeutic range for people taking warfarin for disorders such as atrial fibrillation or blood clots.  When the INR is higher than the recommended range, it means that your blood clots more slowly than desired, and a lower INR means your blood clots more quickly than desired.  See Mayo Clinic Staff, Prothrombin Time Test, Mayo Clinic (August 1, 2019 15:07:00 EDT), https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661.

36.     As the foregoing reflects, as of August 18, 2017 at 10:50 a.m., the PRJA Superintendent, Teklu, Smith, Johnson, and nursing staff at the Jail all had actual and specific knowledge of Sisson's case, his condition, and the MCV orders that were to be followed upon Sisson's return to the Jail.

37.     An employee, agent, and/or servant of the PRJA ordered that, upon Sisson's return, he was to be housed in a single cell located in the booking area and *maintained on a fifteen (15) minute watch* until approved by medical to return to general population.  Despite this order, Sisson would not be coded into the Jail medical system as a "medical observation" inmate until 12:28:35 on August 20, 2017.

38.     Upon returning to the Jail on August 18, 2017, Sisson was deaf.  He was housed in cell J-4, a cell in the booking area, where he would stay until the date of his death.

39.      Throughout the remainder of August 18, 2017 (i.e., following his return from MCV), Defendants: (1) never once provided Sisson any medication; (2) never once gave Sisson a receiving or medical screening by a facility physician or other medical staff; (3) never once checked Sisson's vitals, blood pressure, heart rate, pulse oximetry, respirations, breathing, perfusion, or mental or neurological status; or (4) drew blood to check his INR or blood glucose levels.

40.     Indeed, the Jail's medical records fail to reveal any patient assessment of any kind by Defendants or anyone else on August 18, 2017.  This may be explained, in part, by the fact that at no point on August 18, 2017 was Sisson ever listed as a "medical observation" inmate.

### August 19, 2017

41.     At 12:47 a.m. on August 19, 2017, Tamika Mitchell, an employee, agent, and/or servant of Mediko or PRJA, downloaded into the Jail's medical record system a complete copy

of all of Sisson's MCV medical records including all progress notes, consultation notes, medication information, and doctor's orders and recommendations.

42.     Thus, by 12:47 a.m. on August 19, 2017, with the MCV records at their disposal, all Defendants had actual, specific knowledge of Sisson's case, condition, and medical needs. By this point in time, all Defendants knew or should have known of the gravity of Sisson's condition.

43.     Throughout the entirety of August 19, 2017, Defendants: (1) never once provided Sisson any medication other than 800 mg of Ibuprofen (at 1300 hrs and 2100 hours) and 500 mg of Penicillin (at 2100 hours); (2) never once gave Sisson a receiving or medical screening by a facility physician or other medical staff; (3) never once checked Sisson's vitals, blood pressure, heart rate, pulse oximetry, respirations, breathing, perfusion, or mental or neurological status; or (4) drew blood to check his INR or blood glucose levels.

44.     Indeed, the Jail's medical records fail to reveal any patient assessment of any kind by Defendants or anyone else on August 19, 2017.  This may be explained, in part, by the fact that at no point on August 19, 2017 was Sisson ever listed as a "medical observation" inmate.

45.     On August 19, 2017 at approximately 7:00 p.m., Sisson placed a telephone call to his brother.  An unidentified correctional officer helped Sisson communicate with his brother due to the hearing loss Sisson sustained from the assault.  During the telephone conversation with his brother, Sisson made frantic statements to the effect that he was scared, had blood in his ears, could not hear, could not see out of an eye, did not feel right, and was not receiving any medical attention at the Jail.  Medical assistance was never given to Sisson.

**August 20, 2017**

46.    According to Jail medical records, on August 20, 2017, Defendants gave Sisson enoxaparin at 0700 hours and 2100 hours, and prednisone at 0700 hours.  However, throughout the entirety of August 20, 2017, Defendants never once gave Sisson a receiving or medical screening by a facility physician or other medical staff or drew his blood to check his INR or blood glucose levels.

47.    During the morning hours of August 20, 2017, Sisson placed a second telephone call, this time to his aunt.  An unidentified correctional officer helped Sisson communicate with his aunt due to the hearing loss sustained from the assault.  During the telephone conversation with his aunt, Sisson again frantically pleaded for medical assistance.  Medical assistance was never given to Sisson.

48.    As stated previously, it was not until 12:28:35 on August 20, 2017, that Sisson was finally coded as a "medical observation" inmate.  Defendants thereupon took a set of vitals from Sisson (the only that would be taken of him between his return from MCV on August 18, 2017, and the morning of his death) at 12:29 p.m.  That set of vitals consisted solely of the following pieces of information:

| | |
|---|---|
| Date of Reading | 08-20-2017 12:29 pm |
| Date Entered | 08-20-2017 12:29 pm |
| Blood Pressure Sitting | 106/64 |
| Blood Pressure Standing | [blank] |
| Pulse Sitting | 66 |
| Pulse Standing | [blank] |
| Respiration | 20 |
| Temperature | [blank] |
| Weight | [blank] |
| SPO2 | [blank] |
| Notes | [blank] |

This sparse set of information is the sum total of *all vitals information* Defendants took of Sisson between his return to the Jail from MCV on August 18, 2017, and the morning of his death on August 21, 2017.

49.     At no point on August 20, 2017, did Defendants check Sisson's mental or neurological status.

50.     At 10:56 p.m. on August 20, 2017, Sisson complained to Johnson that he felt dizzy and had a headache.  Johnson also noted that Sisson's gait was "Unsteady."  Johnson's response to this development was to merely write into the Jail's medical records "wil [sic] refer pt to md for review."

### August 21, 2017

51.     As stated previously, when Sisson was brought back to the Jail, he was ordered to be placed on 15-minute checks.  Unfortunately, between at least 12:03 a.m. and 6:53 a.m., these checks never happened.  Nevertheless, Jones falsified the booking housing sheet to falsely reflect that he had performed the required checks:

## PIEDMONT REGIONAL JAIL AUTHORITY
### BOOKING HOUSING SHEET

Date: 8/21/17    Assigned Cell: J4    Booking #: 1502103

Inmate Name: Sisson, Jason    Permanent ID#: 9957004    Reason

for Housing: Medical Observation

**THIS FORM WILL BE USED FOR NON LEVEL II SUICIDE OBSERVATION**

| Time | Initial | Time | Initial | Time | Initial | Time | Initial | Time | Initial | Time | Initial |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0003 | ABB | 0015 | ABB | 0032 | nj | 0039 | nj | 0048 | nj | 0103 | nj |
| 0110 | nj | 0126 | nj | 0139 | nj | 0145 | nj | 0154 | nj | 0206 | |
| 0218 | nj | 0229 | nj | 0241 | nj | 0259 | nj | 0311 | nj | 0326 | nj |
| 0335 | nj | 0347 | nj | 0359 | nj | 0416 | nj | 0419 | nj | 0432 | nj |
| 0444 | nj | 0459 | nj | 0510 | nj | 0520 | nj | 0531 | nj | 0540 | nj |
| 0553 | nj | 0606 | nj | 0613 | nj | 0627 | nj | 0638 | nj | 0653 | nj |
| 0704 | JB | 0717 | JB | 0730 | ABB | 0742 | ABB | 0755 | ABB | 020 | Hb |

16

Baker signed off on these falsified records.

52.    At 3:35 a.m., Sisson attempted to get out of his bunk but was unable to maintain his balance and crashed into his bunk, his jumper around the lower part of his legs:



No one responded.

53.    At 3:36 a.m., Sisson again attempted to get out of his bunk again and crashed headfirst into the concrete floor of his cell:



Sisson managed to get himself back onto his bunk, where he began bleeding profusely from his nose and mouth.  No one responded.

54.    At 3:39 a.m., Sisson tried a third time to get out of his bunk, and this time crashed flat onto his back:

17



No one responded.

55.    At 3:39 a.m., Sisson attempted to get himself up from this prone position, but again he crashed left shoulder first on to the floor near the toilet:



Even more blood began pouring from Sisson's nose and mouth.  No one responded.

56.    Sisson was eventually able to get himself to the toilet which he hovered over from 3:41 a.m. to 3:45 a.m.  Sisson then stood at the exit to the toilet for a few minutes before falling headfirst (his fifth fall within 13 minutes) into his bunk at 3:48 a.m.:

18



Sisson's head ricocheted off the end of the bunk, sending him to the floor once again:



Sisson managed to get himself to the end of his bunk where, in a kneeling position, he rested his

head face down on the bunk, his body motionless with his jumper around his ankles:



57.     At 3:49 a.m., Hicks entered Sisson's cell at the request of Jones. Jones had informed Hicks that he had seen Sisson on the television "rolling around." When Hicks entered the cell, he took note of Sisson's bizarre positioning and the fact that his jumper was around his ankles. Hicks also noted that Sisson was "moving around weirdly" and had his jumper around his ankles. Hicks noted that there was blood on the floor, with drops leading from the bed to the sink. Hicks also noted blood on Sisson's nose, and that Sisson was cold, shivering, making noise and mumbling. Throughout his time with Sisson, Hicks noted that Sisson was unable to hold himself upright without assistance and was incoherent and non-communicative.

58.     Despite Sisson's obviously poor medical condition, and despite the MCV and Jail orders that had been communicated to Defendants, Hicks did not render any medical care or services to Sisson, did not summon either a registered nurse or medical doctor, made no effort to provide or procure emergency medical services for Sisson, and made no effort to have him transported for emergency medical services.

59.     Instead, Hicks merely called Johnson, an LPN.

60.     At 3:52 a.m., Johnson arrived at the cell. Johnson and Hicks cleaned the blood off of Sisson's hands and face. Johnson tried to take Sisson's vitals (blood pressure, pulse oximetry, and heart rate) from 3:57 a.m. until 4:02 a.m. However, the video reflects that her efforts were unsuccessful as she was unable to work the Dinamap monitor.

61.     At 4:03 a.m., Johnson requested that an officer bring her a manual blood pressure cuff because of her inability to work the Dinamap monitor. Throughout this time, from 3:57 a.m. to 4:03 a.m., Sisson intermittently, and weakly, reached out his right hand to Hicks and Johnson. They responded by swatting his hand away.

62.    At 4:05 a.m., a manual cuff is brought.  Johnson struggled to take Sisson's blood pressure manually (even with Hicks helping hold Sisson upright), and no vitals information was recorded at this time.  Hicks and Jones put a blanket on Sisson and depart the cell at 4:09 a.m.

63.    Throughout this entire encounter, Sisson was incoherent and non-communicative.

64.    Throughout this entire encounter, neither Hicks nor Johnson summoned either a registered nurse or medical doctor, made any effort to provide or procure emergency medical services for Sisson, or made any effort to have him transported for emergency medical services.

65.    In short, at 4:09 a.m., Defendants merely left Sisson in this condition without ever making any effort to summon emergency medical services, or further evaluation by a registered nurse or medical doctor.



66.    At 5:05 a.m., Sisson began pounding frantically on the metal shelf in his cell, trying to draw attention to himself.



No one responded.

67.    At 5:06 a.m., he again began pounding on the metal shelf in his cell:



Sisson was again ignored.

68.    At 5:08 a.m., Sisson again frantically pounded on the metal shelf in his cell seeking to draw attention.

22



No one responded.

69.    At 5:09 a.m., a correctional officer entered the cell and just stared at Sisson.  He made no effort to communicate with Sisson.  The guard departed at 5:10 a.m. without doing anything; he just stared at Sisson, then left.



70.    Less than a minute after the unidentified guard departed, Sisson again frantically banged on the metal shelf:



No one responded.  Sisson would then alternate between passing out and writhing about until 5:29 a.m.

71.    At 5:30 a.m., Sisson began banging his hand and kicking the cell door, as well as the wall next to the door, trying to get attention:



Sisson would continue to kick the wall and bang his hand on his metal shelf for at least two full minutes before passing out again.



No one responded.

72.    At 5:46 a.m., Sisson again pounded frantically on the cell door.



Sisson was ignored.

73.    At 5:49 a.m., Sisson again pounded on the cell door.



No one responded, and Sisson passed out seated upright next to the cell door.

74.     At 5:56 a.m., Jacob Wood ("Wood"), a correctional officer, entered Sisson's cell to leave a breakfast tray.  Despite Sisson's awkward positioning, his disheveled appearance, obvious incoherence, and the frantic pleas of the last 51 minutes, Wood did not attempt to communicate, evaluate, or otherwise interact with Sisson.  Instead, Wood just dropped off the tray and immediately departed the cell.



75.     At 6:11 a.m., Sisson began pounding on his metal shelf again:



No one responded.

76.     At 6:13 a.m., Sisson began kicking and banging his fists on the cell door and wall next to the door again:

26



No one responded.

77.    At 6:14 a.m., Sisson began kicking the cell door again:



Sisson was again ignored.

78.    At 6:15 a.m., Sisson began bleeding from his nose or mouth.  He held up his hand to the camera to show this development.  He then began banging on the cell door again:



27

A correctional officer walked into Sisson's cell, looked at him, turned around, and walked out.



After the correctional officer walked out, Sisson banged on his cell door a couple more times, then briefly passed out again.

79. At 6:16 a.m., Sisson began banging on the metal shelf again:



No one responded.

80. At 6:17 a.m. Sisson began kicking the wall next to his cell door and banging on the metal shelf:

28



Sisson was ignored.

81.    At 6:23 a.m., Sisson managed to get himself up to a seated position and start banging on his cell door again:



No one responded.

82.    At 6:25 a.m., Sisson attempted to get on his feet as a correctional officer entered the cell with an ice pack.

29



*With the correctional officer still present and watching*, Sisson came crashing down to the floor, landing on his back:



The correctional officer gave the ice pack to Sisson then left the cell, without summoning any medical attention.

83.    At 6:27 a.m., Sisson positioned himself half-on and half-off of his bunk, with his head, upper torso, and waist on the floor, one leg propped on his bunk, and with his jumper about the lower part of his legs.  Sisson would stay on the floor writhing about *for at least sixteen (16) minutes*:

30









84.    At 6:44 a.m., Sisson began banging on a metal stool in his cell:



31

Sisson was ignored.

85.     At 6:45 a.m., Sisson managed to get himself in to a seated position and began beating his bunk with one of his shoes:



In addition, he began kicking the cell door.  In doing so, he fell back into a metal stool where he came to rest.



No one responded.

86.     At 6:46 a.m., Sisson began kicking the cell door again, with more force than ever. He would continue to intermittently kick the cell door, and bang on it with his fist and shoe, for almost 3 minutes.

32



Sisson was ignored.  He collapsed to the floor.

87.    At 6:52 a.m., Sisson began banging on the side of his bunk, and kicking the cell

door:



No one responded.

88.    At 6:54 a.m., Sisson again kicked the cell door.



Sisson was ignored.

89.     At 6:58 a.m., Sisson gently (and undoubtedly inaudibly) banged his right elbow against the concrete floor a few times in a vain effort to summon help:



No one responded.

90.     At 6:59 a.m., Sisson began foaming at the mouth.



91.     At 7:04 a.m., a nurse, believed to be Smith, finally entered Sisson's cell.



Prior to this time, the last time Sisson had been seen by a health care professional was 4:09 a.m., almost three (3) hours before.  The nurse quickly departed the cell and returned with another nurse:



92. At 7:05 a.m., the two nurses and a correctional officer had to try and dress Sisson because he was so incoherent, disoriented, and unable to control his muscles and reflexes:



93. At 7:06 a.m., Sisson's body began making involuntary movements particularly on the right side. The left side of his body was without movement:



94.     By 7:07 a.m., the nurses and guard continued to struggle to get Sisson dressed:



95.     Despite everything that had transpired since Sisson's return to the Jail on August 18, 2017, and all that transpired in the early morning hours of August 21, 2017, and despite it being apparent to at least two nurses as of 7:09 a.m. that Sisson was incoherent, disoriented, and paralyzed on the left side of this body with involuntary motor movement on the right side of his body, by this time *still no one had called 911*.



96.     Finally, at 7:10 a.m., someone from the Jail called 911.

97.     At 7:10 a.m., Johnson returned to assist with Sisson.  This was the first time Johnson had attended to Sisson since 4:09 a.m.  Johnson was once again unable to work the Dinamap monitor.  As before, Johnson resorted to trying to take Sisson's blood pressure manually with a blood pressure cuff and stethoscope; however, Johnson was unable to perform this even basic nursing skill and had to turn the matter over to another nurse.  As with her 4:09 a.m. visit, Johnson again recorded no vitals information at this visit.

98. By 7:22 a.m., Sisson was thoroughly unresponsive, and all discernible motor function had ceased.

99. At 7:22:37 a.m., EMTs with the Prince Edward Volunteer Rescue Squad arrived in Sisson's cell. This was Sisson's presentation upon the EMTs arrival:



Paramedic Ryan Cambridge would later describe Sisson's condition as follows:

**Narrative:** PEVRS Rescue 11 was dispatched to Piedmont Regional Jail for a 34YOM possibly having a stroke. Upon arrival at PRJ EMS had to wait at the gate to be let into the jail. Once inside EMS found the patient on the floor of a jail cell in booking with nursing staff by his side. Patient was unresponsive, but was breathing and had a pulse. Nursing staff advised that they found the patient on the floor in this condition. Thy stated that last week he had been severely assualted and had been admitted to VCU

Cambridge would also describe his initial clinical assessment of Sisson as "Mental Status: Unresponsive," and "Eye: Nonreactive":

**Assessment Summary**

08/21/2017 07:27:00

**Detailed Findings**

| Location | Description | Details |
|---|---|---|
| Mental Status | Unresponsive | |
| Head | Swelling Contusion | |
| Face | Swelling | |
| Eye Bilateral: | Non-Reactive | |

Finally, Cambridge would score Sisson as a 3 on the Glasgow Coma Scale ("GCS") consistently throughout the entire time he cared for him, based upon the following factors: [3]

**Vitals**

| Time | BP | Limb | Pulse | Rhythm | Resp | Effort | SpO2 Qual | CO2 | GCS | Pain Scale | Stroke PTA | RTS | Pt. Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07:29:00 | Not Applicable/Not Applicable | | 80 | Regular | 12 | Shallow | | | 3 | | No | | |
| 07:34:00 | Not Applicable/Not Applicable | | 0 | | 0 | Apneic/Absent | | | 3 | | No | | |
| 07:40:00 | 147/82 | | 140 | Regular | 20 | Mechanically Assisted (BVM, CPAP, etc.) | 97 | | 3 | | No | 8 | |

**GCS**

| Time | Eye | Motor | Verbal | Score Qualifier |
|---|---|---|---|---|
| 07:29:00 | No eye movement when assessed (All Age Groups) | No Motor Response (All Age Groups) | No verbal/vocal response (All Age Groups) | Initial GCS has legitimate values without interventions such as intubation and sedation |
| 07:34:00 | No eye movement when assessed (All Age Groups) | No Motor Response (All Age Groups) | No verbal/vocal response (All Age Groups) | Initial GCS has legitimate values without interventions such as intubation and sedation |
| 07:40:00 | No eye movement when assessed (All Age Groups) | No Motor Response (All Age Groups) | No verbal/vocal response (All Age Groups) | Initial GCS has legitimate values without interventions such as intubation and sedation |

---

[3] The GCS was described by Graham Teasdale and Bryan Jennett (Assessment of coma and impaired consciousness. A practical scale. Lancet 1974; 2:81-4.) in 1974 as a method to convey the level of a patient's consciousness, based upon measures of motor responsiveness, verbal performance, and eye opening to appropriate stimuli. See Royal College of Physicians and Surgeons of Glasgow, What is GCS - Glasgow Coma Scale (August 18, 2019 11:37:40 EDT), https://www.glasgowcomascale.org/what-is-gcs/. Under criteria set forth by the Centers for Disease Control and Prevention ("CDC"), at an "8" a patient is considered "comatose"; a "3" is the absolute lowest GCS score, indicative of no motor responsiveness, no verbal ability, and no eye movement. See CDC, Glasgow Coma Scale (August 18, 2019 11:39:17 EDT), https://www.cdc.gov/masstrauma/resources/gcs.pdf.

39

100. In the cell, the EMTs placed Sisson on a backboard and secured him in place with spider straps and head blocks. As the EMTs placed secured the spider straps and placed the backboard on the stretcher, Sisson stopped breathing. Sisson's pulse was checked, and he was noted to be pulseless. The EMTs began their first round of CPR on Sisson at 7:28 a.m. immediately upon exiting Sisson's cell and departing the booking area:



101. The foregoing would not prevent Davis from later lying to both U.S. Department of Justice ("DOJ") and Virginia Department of Corrections ("VDOC") officials affiliated with the Consent Decree entered in United States of America v. Piedmont Regional Jail Authority, Civil No. 3:13-cv-646-REP (U.S. District Court for the Eastern District of Virginia), about Sisson's condition:

From: Jim Davis [mailto:jhdavis@prjva.org]
Sent: Tuesday, August 22, 2017 10:59 AM
To: Donald Hunter <dlhunter@prjva.org>; Cohen, Zachary D. <zcohen@t-mlaw.com>; Aranon Fleisher
<Aaron.Fleisher@usdoj.gov>; Cathleen Trainor <cathleen.trainor@usdoj.gov>; James Welch
<jamescwelchrn@gmail.com>; Lawrence, Donna C. (VADOC) <Donna.Lawrence@vadoc.virginia.gov>; Solomon, Wayne
(VADOC) <Wayne.Solomon@vadoc.virginia.gov>
Subject: Additional Information relative to the death of the inmate

To All:

In my previous email, I failed to relate that inmate Sisson was alert and communicating
with staff at the time he was transported from Piedmont Regional Jail to Centra Hospital
on August 21, 2017.

--
Respectfully:

Jim Davis
Director of Compliance/Accreditation
Piedmont Regional Jail Authority
jhdavis@prjva.org
(434) 392-1601 (W), Ext.242
(434)-390-3631 (C)
(434)-392-5504 Fax

102.   Once the EMTs loaded Sisson into the ambulance, they rechecked his pulse and noted it had returned. The EMTs also noted that Sisson had shallow respirations. The EMTs began to transport Sisson to CSCH on an emergency basis.

103.   When the EMTs were approximately 30 seconds away from CSCH, Sisson again went into respiratory arrest. The EMTs supported Sisson's respirations by bag valve mask. Sisson arrived at CSCH at approximately 7:44 a.m.

104.   According to labs drawn at CSCH at 7:54 a.m., Sisson had an INR of 1.27 -- well below the therapeutic range that had been ordered by MCV, and consistent with someone *not* on anti-coagulant therapy. Sisson was noted to have massive intracranial hemorrhaging.

105.   Sisson was promptly transferred via MedFlight to MCV. According to MCV labs drawn at 11:07 a.m., Sisson had an INR of 1.1, again consistent with someone not on anti-coagulant therapy. Sisson suffered a cardiac arrest at MCV but his pulse returned following chest compressions.

106.    By 6:10 p.m. on August 21, 2017, it was determined that Sisson was brain dead. Sisson remained on life support while a decision was made whether to harvest his organs or preserve his body for a medical examiner investigation.  Sisson was ultimately terminally extubated and died of cardiac arrest at 5:48 p.m. on August 22, 2017.  The cause of Sisson's death, according to MCV, was "transforaminal herniation due to epidural hematoma causing brain death and subsequent cardiopulmonary death."

107.    The Office of the Chief Medical Examiner ("OCME") conducted an autopsy on August 23, 2017.  Among its findings, the OCME noted severe head trauma with intracranial hemorrhage, brain contusion, and skull fracture.  An examination of Sisson's brain revealed that it was riddled with clots and hemorrhages.  The OCME determined Sisson's cause of death to be "Complications of blunt force injury to head."

108.    Johnson would later try and cover her tracks by backdating and entering into the Jail medical records the following fraudulent medical information:

| 08-21-2017 7:12 am | Writer was called to J-4 observed pt laying on sleigh, per security pt was walking from toilet to sleigh slipped and fell. VS: 97.8 64 18 124/80 O2 sat 99%. Pt assess appear to have small amount of bleeding from nasal cavity, no injures noted area was clean. pt was giving ice packs for prior injures. Writer will passed information to am nurse. | Johnson, Kaskha | Medical Staff | Misc. Note |
|---|---|---|---|---|
| 08-21-2017 7:58 am | Late Entry enter due to pill pass unable to chart of incident @ 0345 am | Johnson, Kaskha | Medical Staff | Misc. Note |

That these entries were fraudulent is supported by the fact that: (1) Johnson never wrote down any vitals readings; (2) Johnson never entered any vitals readings into the Jail's medical records contemporaneously with allegedly taking any such readings; (3) Johnson never took Sisson's temperature, and thus would have no way of knowing that his temperature just happened to be 97.8° (normal); (4) Johnson was never able to work the Dinamap, and was unable to take Sisson's blood pressure manually, and thus would have no way of knowing that his blood pressure just happened to be 124/80 (nearly normal).

109.    Jones would later admit to Virginia State Police officials that he had been aware that Sisson was banging and kicking the door throughout the morning hours of August 21, 2017.

110.    Another inmate in the booking area from the evening hours of August 20, 2017 through the morning hours of August 21, 2017, recalls hearing Sisson continuously crying and begging for help from inside his cell.  Sisson, with slurred speech, was pleading for medical assistance, and for someone to call 911.  In addition, an inmate recalls hearing Jail staff, in response to Sisson's pleas for help, berating Sisson and yelling "shut the hell up!" on multiple occasions throughout the night.

111.    On August 23, 2017, Lt. Steve Wade ("Wade") fired Jones for his fraudulent entries into the Jail booking housing sheet.  In his memorandum terminating Jones' employment, Wade wrote, inter alia:

> Officer Jones, on 8-21-2017 at 0727 hours inmate Sisson . . . was transported to Centra Southside Hospital for further evaluation due to him allegedly falling on the floor in his cell.  After reviewing the camera system, it was found that no security checks were made properly during the hours of 0003 hours through 0653 hours.  The security checks are to be made every 15 minutes in the booking area.  By not making proper security checks lead to someone being transported to the hospital.  This type of behavior will not be tolerated.

112.    Baker would later admit to Virginia State Police officials that, after the initial encounter with Sisson after 3:30 a.m., she and other correctional officials assumed Sisson may have fallen due to his jumper being around his ankles.

113.    On August 23, 2017, Wade also demoted Baker from Sergeant to Officer.  In his memorandum demoting Baker, Wade wrote, inter alia:

> Sergeant Baker, on 8-21-2017 at 0727 hours inmate Sisson . . . was transported to Centra Southside Hospital for further evaluation due to him allegedly falling on the floor in his cell.  After reviewing the

camera system, it was found that no security checks were made properly during the hours of 0003 hours through 0653 hours. After further investigation, it was also determined that you as the supervisor was in the booking areas during some of those times and did not make or instructed anyone to make the security checks. As a supervisor, you have to take ownership of your shift and make sure that the day to day operation of the jail is being followed. The security checks are to be made every 15 minutes in the booking area. By not making proper security checks lead to someone being transported to the hospital. I spoke to you about this situation and you had no explanation of why the security check weren't made. This type of behavior will not be tolerated.

114.    Finally, Johnson was terminated from her employment on August 30, 2017, following an internal review of Sisson's death.

## A HISTORY OF PROVIDING CONSTITUTIONALLY INADEQUATE MEDICAL CARE

115.    Contrary to Wade's assertion, the kind of unacceptable, cavalier attitude towards inmate health exhibited by Defendants in August of 2017 has long been tolerated at the Jail and by Defendants in particular. Indeed, Defendants have a well-documented custom, policy, pattern and/or practice of providing constitutionally inadequate medical care to inmates. This unconstitutional custom, policy, pattern and/or practice of denying and delaying medical treatment directly and proximately caused Sisson's death.

116.    The problems with inmate health care at the Jail can be traced back at least as far as 2006. In particular, the Jail received intense scrutiny from the media and U.S. Immigration and Customs Enforcement ("ICE") officials following the highly publicized death of Abdeulaye Sall, who died at Piedmont in December 2006 due to the lack of medical treatment for a kidney condition. In a December 4, 2006 report issued by the ICE Office of Detention and Removal Washington Field Office -- a report that was triggered by the 2006 death of Mr. Sall -- ICE officials acknowledged that Piedmont failed to provide appropriate medical care to immigration

44

detainees, noting that "[t]he medical health care unit does not meet minimum ICE standards." In the report, ICE further acknowledged that Piedmont "ha[d] failed on multiple levels to perform basic supervision and provide for the safety and welfare of ICE detainees." The report concluded: "The line of communications in the Medical department at [Piedmont] is poor and detainee health care is in jeopardy."

117.   ICE had also received complaints from detainees requesting that the Office of Inspector General ("OIG") at the Department of Homeland Security ("DHS") investigate whether detainees were receiving proper medical care at Piedmont. In 2005, a complainant at the Jail told the DHS OIG that he had not received adequate medical attention. In 2006, DHS OIG received another complaint from a detainee at the Jail who was denied proper medical care after the detainee's arm was broken when he was attacked during his detention. In 2007, the DHS OIG began an investigation regarding the death of a detainee who had allegedly received grossly inadequate medical care and died while detained at the Jail. The same year, DHS OIG received another complaint related to the inadequate medical care offered to detainees at Piedmont.

118.   In 2007, the American Bar Association ("ABA") sent a delegation to inspect the immigrant detainee center at the Jail to determine its compliance with the Immigration and Naturalization Service's November 2000 ("INS") *INS Detainee Standards*, later rebranded *ICE Detainee Standards*. A true and accurate copy of the ABA's report, as redacted by ICE, is attached hereto as Exhibit C. With respect to access to medical care, the ABA delegation found that the Jail had only "partially" complied with its obligations under the *ICE Detainee Standards* as several detainees "reported that there were long waits for medical care and that medical requests were not fully responded to." Id. at 13. The delegation noted that one detainee reported

45

that he had made four requests for medical care beginning two months prior and still had not seen a doctor. Id. Another detainee reported to the delegation that the wait to see a doctor was usually three to four days, but sometimes a week or longer especially for non-emergencies. Id. The delegation recommended that the Jail "ensure there are no unreasonable delays in responding to non-emergency sick-call requests." Id. at 22.

119.    On July 18, 2008, the Joint Intake Center for DHS in Washington, D.C. also received information that a detainee at the Jail was being denied medical attention by Jail personnel. The complainant alleged that he had submitted thirteen requests for medication, all of which were denied.

120.    On November 28, 2008, ICE detainee Guido Newbrough, a German national, died of a painful bacterial staph infection . . . a treatable condition . . . that had caused him to complain to Jail officials for at least five weeks beforehand of severe back pain, stomach aches, frequent urination, dizziness, fatigue, and other symptoms. His estate filed a wrongful death and civil rights action against the PRJA, the Jail's Chief Medical Officer and Physician, Superintendent, and various other employees, agents, and servants of the Jail. See Newbrough v. Piedmont Reg'l Jail Auth., Case No. 3:10-cv-867-HEH-DJN (U.S. District Court for the Eastern District of Virginia). A true and accurate copy of the Second Amended Complaint is attached hereto as Exhibit D. The Newbrough case was settled for $350,000.

121.    According to the DOJ, following the last of a series of allegedly preventable deaths that occurred at the Jail between 2006 and 2009, ICE concluded that medical care at the Jail had fallen so far below acceptable standards, the Jail could no longer be used to house ICE

detainees. [4]  See Letter of September 6, 2012 from DOJ to James Garnett, Chairman, Board of Directors, Piedmont Regional Jail at 2, n.1 (hereinafter "DOJ Findings Letter") (attached as Exhibit E).  Upon information and belief, ICE never again housed detainees at the Jail.

122.    On May 6, 2009, inmate Michael Baker died a mere six days following the April 30, 2009 start of his incarceration at the Jail from septic ascites, a bacterial infection of the lining of the abdominal cavity.  Baker's estate filed a wrongful death and civil rights action against the Jail's Chief Medical Officer and Physician, Superintendent, Assistant Superintendent, and various other employees, agents, and servants of the Jail.  See Carter v. Gordon, Case No. 3:10-cv-608-MHL-DWD (U.S. District Court for the Eastern District of Virginia).  A true and accurate copy of the Complaint is attached hereto as Exhibit F.  Plaintiff alleged that Baker complained on April 30, 2009, that he felt pain in his chest area, and told Jail medical staff that he had a history of bleeding ulcers.  On May 1, 2009, Baker vomited and complained of left-sided pain.  Baker also showed signs of being in pain on May 2-3, 2009.  On May 4, 2009, Baker again complained of feeling ill and filled out a sick call slip.  Nevertheless, Baker received no medical attention.  On May 5, 2009, Baker complained to multiple correctional officers about his pain.  Rather than taking Baker to the medical department, the officers berated Baker and placed him in a booking cell.  During the night of May 5, 2009, Baker constantly begged for medical attention, and never received it.  Baker was returned to his housing unit the following day.  Throughout the entirety of May 6, 2009, Baker continued to complain of pain and, as in the instant case, showed objective signs of distress and discomfort.  As in the instant case, Baker was observed disoriented and falling over on multiple occasions.  Despite repeated pleas for medical

_____

[4] Given the timing, Newbrough's death was likely the one that spurred ICE to pull all of its detainees out of the Jail.

assistance, including from fellow inmates, Baker was never sent out for medical assistance and died that evening. The Carter case settled for $750,000.

123.   In 2011, DOJ was compelled to act. In March of that year, DOJ opened up an investigation of the Jail pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"), and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). The DOJ noted that "[o]ur initial inquiry was prompted, in part, by a series of allegedly preventable deaths in the Jail between 2006 and 2009." See DOJ Findings Letter at 2. Following tours of the Jail in 2011 and 2012, extensive interviews with staff and prisoners, and a review of "an array of documents, including policies, procedures, and medical records," the DOJ concluded on September 6, 2012 that it had "reasonable cause to believe that the Jail is denying necessary medical and mental health care, and consequently places prisoners at an unreasonable risk of serious harm, in violation of the Constitution." The DOJ also noted that "deficiencies in the medical and mental health care provided to prisoners at Piedmont place prisoners at a substantial risk of serious harm." Id. at 3. The DOJ noted that "[m]any of the lapses we identif[ied] are directly related to Piedmont's inadequate medical staffing." Id. With respect to deficiencies in medical care, the DOJ in particular noted the following, among other things:

(a)   Piedmont exposes prisoners to risk of harm by relying on unqualified staff to perform essential medical functions (DOJ Findings Letter at 4);

(b)   Intake screening procedures do not promptly identify medical problems (DOJ Findings Letter at 6);

(c)   Piedmont's lack of a chronic care program places prisoners at risk of harm (DOJ Findings Letter at 7);

(d)   Piedmont's sick call system places prisoners at risk of harm (DOJ Findings Letter at 9); and

(e)     Training gaps increase the likelihood of harm (DOJ Findings Letter at 11).

124.    On September 20, 2013, the United States filed suit against the PRJA to redress the constitutional violations identified by DOJ. See United States v. Piedmont Reg'l Jail Auth., Case No. 3:13-cv-646-REP (U.S. District Court for the Eastern District of Virginia).  A true and accurate copy of the Complaint is attached hereto as Exhibit G.  The Complaint alleged, among other things, that:

(a)     The United States, pursuant to an investigation of Piedmont, has determined that Piedmont, through its acts and omissions, engages in a pattern or practice of deliberately disregarding known or serious risks of harm to prisoners at Piedmont;

(b)     Defendant has failed to take reasonable measures to protect prisoners against serious harm by permitting unqualified personnel to evaluate and manage serious medical conditions;

(c)     Defendant does not adequately screen incoming prisoners for medical issues, and even when screenings are performed, they are often not sufficiently documented;

(d)     Defendant has no chronic care program, and thus prisoners with medical and mental health issues are not properly identified and tracked; and

(e)     Defendant has not adequately trained its staff on suicide prevention, mental health care, and first-responder medical care.

Id. at 2-3.

125.    The United States alleged that, as a result, the PRJA had "subjected prisoners at Piedmont to a pattern and practice of conditions of confinement which deprive them of rights, privileges, and immunities secured and protected under the Constitution of the United States, causing such prisoners to suffer grievous harm," and that the PRJA had "exhibited deliberate indifference to the health and safety of Piedmont prisoners, in violation of the rights, privileges, or immunities of those prisoners as secured or protected

by the Constitution of the United States."[5]

126.    On May 29, 2016, inmate Thomas Cubbage died at the Centra Southside Community Hospital ("Southside") in Farmville as result of complications from cardiopulmonary arrest.  His estate filed a wrongful death and civil rights suit against Mediko, P.C. and certain employees of the company.  See Carolyn Cubbage, Adm'r v. Piedmont Reg'l Jail Auth., Case No. 3:18-cv-333-HEH (U.S. District Court for the Eastern District of Virginia).  A true and accurate copy of the Second Amended Complaint is attached hereto as Exhibit H.  Plaintiff alleged that Cubbage's death occurred: (1) a full five days after it was reported to PRJ correctional officials that Cubbage was coughing up blood and could not breathe while lying down; (2) three days after a chest x-ray revealed an abnormality in Cubbage's right upper lobe, which prompted no further medical follow-up; and (3) a day after several inmates had pleaded with guards for hours to summon medical assistance for Cubbage because he was in such obvious distress.  The Cubbage case settled for $230,000.

127.    Of particular note, Defendant Jones was also a defendant in the Cubbage case.  As in the instant case, the plaintiff in Cubbage alleged that Jones had failed to conduct security checks as required.  Id. at ¶¶ 19-21.

128.    Hettie Smith, LPN, a defendant in the Cubbage case and former Mediko employee, testified unequivocally in that case that, on the weekends in particular, the Jail would as a matter of policy be understaffed for purposes of attending to inmate medical needs:

---

[5] On the same day the Complaint was filed, the parties filed a join request for entry of a Consent Decree which included appointment of a Court monitor, and routine reporting on benchmarks the Jail was required to try and meet.

Page 75

Q. Weekend. Okay. How do you -- how do you know it was the weekend?

A. Because I was the only nurse there.

Q. When you say you were the only nurse there, can you explain what you mean by that? Only nurse where?

A. In medical.

Q. Were you like physically the only nurse in medical or were you the only nurse working at the time?

A. I was the only nurse working.

Q. So you told me earlier that from Monday through Friday, there would -- there would typically be three LPNs and two RNs and then an RN psych and then a psychiatrist and Dr. Moreno, and then like one day a week, the dentist. On the weekend was it normally just one nurse?

A. Yes, sir.

Q. Was -- there were still approximately 400 inmates there on the weekend?

A. Yes, sir.

Q. Do you -- do you have any understanding why there was only one nurse there on the weekends?

MS. BREWER: Object to the form of the question.

You can answer.

A. That's the way the schedule was.

Q. Okay. You didn't have any control over that

Page 76

schedule?

A. No, sir.

Q. Did you feel like one nurse was enough to address all the inmate needs on the weekends?

MS. BREWER: Object to the form of the question.

You can go ahead and answer.

A. No, sir.

Q. Why is that? Why?

A. Because there was a lot of those inmates there.

Q. So would there be times when you were there on the weekends that you just couldn't get to everything that needed to be done?

A. Yes, sir.

Q. And that's because you were the only person there?

A. Yes, sir.

Q. Was this day one of those days?

A. Yes, sir.

Q. Can you -- can you just -- can you explain that a little bit?

A. Everything stops when there is a code blue. That takes priority. So if you're attending to a code blue, you can't do anything else. It's impossible.

Q. Do you remember exactly like what you were

129.    Likewise, in this case, upon information and belief, throughout the weekend of August 19 and 20, 2017, only one nurse was on duty at the Jail.

130.    Following Sisson's death, the Jail Review Committee of the Virginia Board of Corrections engaged Special Agent T. Stephen Goff to investigate and issue a report of his findings. In his report, Special Agent Goff found that the Jail had:

a.    violated VDOC regulation 6VAC15-40-370 (Receiving and Medical Screening of Inmates) through its failure to perform a screening examination of Sisson at any point following his return to the Jail on August 18, 2017. In particular, Special Agent Goff stated:

have been returned to the jail in his condition. This inmate had very serious injuries and obviously did not receive proper medical evaluation or care upon being returned from MCV Hospital It does not appear that the jail is adequately staffed or equipped to oversee a patient with the serious injuries suffered by Sisson.

b.    violated VDOC regulation 6VAC15-40-1045 (Supervision of Inmates) through its failure to perform any proper security checks between 12:03 a.m. and 6:53 a.m., despite the regulatory minimum of two checks per hour at

51

random intervals and the Jail's order that Sisson be checked every fifteen (15) minutes until cleared by medical to be returned to general housing.

131.   On September 19, 2018, based upon the results of the investigation into Sisson's death, as well as that of a female inmate who committed suicide on November 18, 2017 after being left unchecked in her cell for more than two hours and twenty-seven minutes (despite another falsified log book reflecting otherwise), the Board placed the Jail on "Probationary Certification" status "due to standards violations."

132.   The Jail remains on "Probationary Certification" status as of this filing.

133.   Since long before Sisson's death, Defendants, and each of them, have been personally aware, with actual knowledge, of the constitutionally deficient medical care rendered to inmates at the Jail.  Indeed, since long before Sisson's death the Defendants have had a custom, policy, pattern and/or practice of denying and/or delaying medical care to inmates, and/or rendering medical care to inmates that falls well below an acceptable standard of care.  This was the case prior to and including August 18 to 21, 2017.

134.   The Mediko Defendants, in particular, were acutely aware of the deficiencies in medical care at the Jail as they used the DOJ's Findings Letter and Consent Decree, and their promise to turn the situation at the Jail around . . . at a low cost . . . as a selling point to secure a seven figure contract with the Jail.

135.   The deficiencies at the Jail have been identified, investigated, and indeed litigated by federal officials.

136.   The deficiencies at the Jail have been identified, investigated, and subject to adverse administrative action by state officials.

52

137.    The deficiencies at the Jail have been the subject of numerous prior civil actions, including many filed by *pro se* inmates.

138.    The deficiencies at the Jail have included and, in Sisson's case, did include, the following, among other things:

a.    Failing to properly and promptly respond to an inmate's complaints and requests for medical assistance;
b.    Failing to properly and promptly recognize medical emergencies;
c.    Failing to properly and promptly allow access to emergency medical care;
d.    Failing to ensure a sufficient number of qualified medical personnel are on-site to handle the medical needs of Jail inmates, without compromising the quality of medical care;
e.    Failing to properly and promptly screen incoming prisoners for medical issues and, even when screenings are performed, they are often not sufficiently documented;
f.    Failing to properly monitor and observe inmates with medical needs;
g.    Failing to properly document inmate medical care;
h.    Failing to follow through on orders from medical providers; and
i.    Failing to ensure that Jail and medical personnel are properly trained.

139.    These deficiencies, which have been on-going at the Jail for more than 13 years now, directly and proximately caused Sisson's death.

## DEFENDANTS' DUTIES

140.    At all times while Sisson was incarcerated at the Jail, he was in the custody and under the care of Defendants.

141.    As discussed herein, the Defendants owed duties to Sisson.  Among these duties, Defendants, and each of them, had common law duties of care to Sisson, including affirmative duties to provide adequate medical care or access to adequate medical care.

142.    At all relevant times herein, Defendants, and each of them, also had constitutional, statutory, and administrative duties to Sisson.

143.    Defendants, and each of them, are accountable, under the doctrine of *respondeat*

*superior* liability, for the actions and inactions of their employees and agents, including, but not limited to, Defendants herein.

144. All Defendants owed duties to Sisson to exercise reasonable care in providing him, and/or in providing him timely access to, medical care, nursing care, professional, and/or correctional services during the time period of his incarceration at the Jail.

145. Defendants and other Mediko employees who encountered Sisson had duties to Sisson to render that degree of knowledge, skill, diligence and care to Sisson that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

146. The Mediko Defendants, and all other health care providers who encountered Sisson at the Jail, owed him a duty to exercise the degree of skill and diligence practiced by reasonably prudent practitioners in the applicable field of practice or specialty with respect to the care and treatment of Sisson.

147. At all times relevant herein, a final policymaking decision maker for PRJA was Davis.

148. At all times relevant herein, the final policymaking decision makers for Mediko in the daily provision of medical services at the Jail was Teklu and/or Smith.

149. Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Sisson, and were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent to Sisson's care and needs.

150. Defendants were keenly aware of the medical staffing problems at the Jail, as well as the problems with promptly screening inmates upon their admission into the Jail, the problems with delegating medical care to unqualified individuals, and the need for health professionals to communicate promptly and clearly with medical professionals, and vice versa, concerning the

status of inmates in their care. Indeed, the Jail was subject to an ongoing Consent Decree with the DOJ at the time of Sisson's death, had been previously the target of multiple ICE investigations, and had been previously the subject of multiple civil lawsuits. The Mediko Defendants in particular were aware of the host of problems with inmate medical care at the Jail, as they leveraged those problems (and their promised ability to fix them) as part of their marketing efforts to secure a contract with the Jail.

151. Just as in prior investigations and lawsuits, continuity of care breakdowns continued at the Jail, resulting in Sisson's death. In addition to failing to coordinate care, Defendants failed to adequately staff the jail with sufficient medical personnel, failed to conduct proper and timely examinations, failed to abide by and follow through with medical and Jail orders regarding the observation, monitoring, and care of Sisson, failed to keep proper records, failed to report up the chain of command effectively, failed to form and carry out an effective treatment plan with regard to Sisson, and failed to devise an effective method for handling Sisson's condition.

152. As more fully discussed above, Defendants were aware that the Jail had become the subject of federal and local investigations concerning the failure to provide adequate medical care to inmates. There could have been no greater issue for Defendants to address than the foregoing failures.

153. Defendants' actions and omissions, in denying obvious and necessary care and attention to Sisson, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence of individual defendants, when combined, had a cumulative effect showing a reckless or total disregard of Sisson and his acute medical condition.

154. As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, Sisson suffered

55

constitutional injuries and died.

## COUNT ONE -- WRONGFUL DEATH
### Virginia Code § 8.01-50
### (Against Defendants PRJA, Baker, Jones, and Hicks)

155.    Plaintiff restates and incorporates herein the allegations set forth in Paragraphs 1 through 154 of the Complaint.

156.    Defendants PRJA, Baker, Jones, and Hicks, and each of them, had Constitutional, statutory, and common law duties to ensure that Sisson's life and health were properly cared for and maintained throughout the time he was within their custody.

157.    Notwithstanding said duties, Defendants PRJA, Baker, Jones, and Hicks, and each of them, breached said duties and operated the jail in a negligent manner by, among other things:

   a.   Failing to perform checks on Sisson as required by, among other things, the Virginia Administrative Code, the policies and procedures of the PRJA, MCV and Jail orders that were issued with respect to Sisson, and under the applicable standard of care in corrections;

   b.   Failing to properly and/or promptly recognize the severity of Sisson's medical emergencies or, if recognized, failing to properly and/or promptly respond to the medical emergencies;

   c.   Failing to properly and/or promptly report Sisson's medical emergencies to jail supervisors, on site nursing staff, and/or medical personnel employed by or contracted with Defendants;

   d.   Failing to properly and/or promptly respond to Sisson's cell in response to his repeated pleas for assistance and efforts to summon assistance;

   e.   Failing to ensure that on-site nurses responded properly and/or promptly to the medical emergencies;

   f.   Failing to properly and/or promptly supervise and monitor Sisson during his detention;

   g.   Failing to properly and/or promptly segregate Sisson in order to monitor him properly;

   h.   Failing to properly and/or promptly monitor Sisson to ensure compliance with MCV orders including, but not limited to, any changes in behavior;

   i.   Failing to properly and/or promptly summon emergency medical services to attend to Sisson; and

j.      Failing to properly and/or promptly transport Sisson, or arrange for the transportation of Sisson, for emergency medical care and treatment.

158.    Defendants Baker, Jones, and Hicks, and each of them, were negligent.

159.    Defendants Baker, Jones, and Hickes, and each of them, were grossly negligent in that their actions and inactions showed such indifference to Sisson as to constitute an utter disregard of caution amounting to a complete neglect of the safety of Sisson, such as would shock fairminded people.

160.    Defendants Baker, Jones, and Hicks, and each of them, were willfully and wantonly negligent in that they acted, or failed to act, consciously in disregard of Sisson's rights. In addition, Defendants Baker, Jones, and Hicks acted, or failed to act, with a reckless indifference to the consequences to Sisson when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would probably result in injury to Sisson.

161.    Defendant PRJA is liable for the negligence, gross negligence, and/or willful and wanton negligence of Defendants Baker, Jones, and Hicks, and was otherwise negligent, grossly negligent and/or willfully and wantonly negligent.

162.    As a direct and proximate result of the negligence, gross negligence, and/or willful and wanton negligence of Defendants PRJA, Baker, Jones, and Hicks, Sisson died.

163.    As a direct and proximate cause of the negligence, gross negligence, and/or willful and wanton negligence of Defendants PRJA, Baker, Jones, and Hicks, which contributed to and was the proximate cause of Sisson's injuries and death, the statutory beneficiary has sustained damages including, but not limited to:

a.   Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b.   Loss of services, protection, care, and assistance provided by the decedent.

164.   As a direct and proximate cause of the negligence, gross negligence, and/or willful and wanton negligence of Defendants PRJA, Baker, Jones, and Hicks, which contributed to and was the proximate cause of Sisson's injuries and death, the Estate of Sisson sustained damages, including, but not limited to:

a.   Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

b.   Reasonable funeral expenses.

165.   The negligence, gross negligence, and/or willful and wanton negligence of Defendants PRJA, Baker, Jones, and Hicks, establish causes of action for monetary relief consisting of compensatory and punitive damages, and costs to the Plaintiff.

### <u>COUNT TWO -- WRONGFUL DEATH</u>
**Virginia Code § 8.01-50**
**(Defendants Mediko, Inc., Mediko, P.C., and Johnson)**

166.   Plaintiff restates and incorporates herein the allegations set forth in Paragraphs 1 through 165 of the Complaint.

167.   Defendant Johnson had Constitutional, statutory, and common law duties to ensure that Sisson's life and health were properly cared for and maintained throughout the time she was within her custody.

168.   The Mediko Defendants, and all other health care providers who encountered Sisson at the Jail, owed him a duty to exercise the degree of skill and diligence practiced by reasonably prudent practitioners in the applicable field of practice or specialty with respect to the care and treatment of Sisson.

169. Notwithstanding said duties, Defendant Johnson breached said duties by failing to provide nursing services within an acceptable standard of medical care within the medical community in a negligent manner by, among other things:

(a) Consistently, utterly abandoning her patient Sisson throughout the early morning hours of August 21, 2017, sometimes for hours at a time;

(b) Failing to abide by orders from, among others, MCV, the Jail, Mediko, Inc., Mediko, P.C., Teklu, and/or Smith regarding the observation, monitoring, and care of Sisson;

(c) Failing to properly and/or promptly identify and treat Sisson's medical emergencies;

(d) Failing to order or make arrangements for Sisson to be transported to a hospital;

(e) Failing to order or make arrangements for Sisson to be sent for further evaluation and/or testing;

(f) Failing to properly observe and monitor Sisson;

(g) Failing to take a set of vitals;

(h) Failing to routinely take a repeat set of vitals;

(i) Failing to promptly check blood pressure, heart rate, and pulse oximetry;

(j) Failing to routinely re-check blood pressure, heart rate, and pulse oximetry;

(k) Failing to assess breathing, respirations, perfusion, and mental or neurological status;

(l) Failing to perform a GCS examination and stroke assessment;

(m) Failing to obtain a SAMPLE history;

(n) Failing to properly and/or promptly summon the assistance of health care providers more adept to address Sisson's medical emergency based upon their education, experience, and/or training;

(o) Failing to call Sisson's emergency contact; and

(p) Failing to summon emergency medical services.

170. Defendant Johnson was negligent.

171. Defendant Johnson was grossly negligent in that her actions and/or inactions showed such indifference to Sisson as to constitute an utter disregard of caution amounting to a complete neglect of the safety of Sisson, such as would shock fair-minded people.

172. Defendant Johnson was willfully and wantonly negligent in that she acted, or failed to act, consciously in disregard of Sisson's rights. In addition, Defendant Johnson acted, or failed to

act, with a reckless indifference to the consequences to Sisson when she was aware of her conduct and also aware, from her knowledge of existing circumstances and conditions, that her conduct would probably result in injury or death to Sisson.

173.    Defendants Mediko, Inc. and Mediko, P.C. are liable for the negligence, gross negligence, and/or willful and wanton negligence of Johnson, as well as for the negligence, gross negligence, and/or willful and wanton negligence of any of their other employees, agents, and/or servants who attended Sisson and/or played a role in Sisson's observation, monitoring, and care, and was otherwise negligent, grossly negligent and/or willfully and wantonly negligent.

174.    As a direct and proximate result of the negligence, gross negligence, and/or willful and wanton negligence of Defendants Mediko, Inc., Mediko, P.C., and Johnson, Sisson died.

175.    As a direct and proximate cause of the negligence, gross negligence, and/or willful and wanton negligence of Defendants Mediko, Inc., Mediko, P.C., and Johnson, which contributed to and was the proximate cause of Sisson's injuries and death, the statutory beneficiary has sustained damages including, but not limited to:

a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b.    Loss of services, protection, care, and assistance provided by the decedent.

176.    As a direct and proximate cause of the negligence, gross negligence, and/or willful and wanton negligence of Defendants Mediko, Inc., Mediko, P.C., and Johnson, which contributed to and was the proximate cause of Sisson's injuries and death, the Estate of Sisson sustained damages, including, but not limited to:

a.    Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

b.    Reasonable funeral expenses.

177.   The negligence, gross negligence, and/or willful and wanton negligence of Defendants Mediko, Inc., Mediko, P.C., and Johnson, establish causes of action for monetary relief consisting of compensatory and punitive damages, and costs to the Plaintiff.

## COUNT THREE -- DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983
### (Deliberate Indifference to Serious Medical Need Resulting in Cruel and Unusual Punishment – Against Defendants Baker, Jones, Hicks, Teklu, Smith, and Johnson)

178.   Plaintiff incorporates Paragraphs 1 through 177 of the Complaint, as if fully set forth herein.

179.   During his incarceration at the Jail, Sisson suffered from a serious medical need, to wit, extensive post-hospital observation, monitoring, and care following Sisson's discharge from MCV on August 18, 2017.

180.   Defendants, and each of them, knew and/or should have known of Sisson's serious medical need, as well as the potentially life-threatening dangers associated with failing to properly and thoroughly observe, monitor, and care for Sisson in a manner consistent with all orders and recommendations from MCV and the Jail.

181.   Nevertheless, at all times relevant to the allegations in this Complaint, Defendants Baker, Jones, Hicks, Teklu, Smith, and Johnson (collectively referred to in this Count as "the Foregoing Defendants"), and each of them, in their individual capacities, were deliberately indifferent to Sisson's serious medical need and disregarded it by denying and/or delaying medical care thereby creating a substantial risk of injury and death and resulting in the unnecessary and wanton infliction of pain upon Sisson, and ultimately his death, all under color of state law and in violation of the Eighth Amendment to the U.S. Constitution.  The Foregoing

61

Defendants' denial and/or delay in providing medical care was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

182.    As described in the Complaint, the Foregoing Defendants failed to provide necessary medical care, and/or access to necessary medical care, in response to an obvious, serious medical need.

183.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Plaintiff's health and safety, thereby placing Plaintiff in substantial risk of serious harm.

184.    At numerous times throughout the course of his detention, the Foregoing Defendants learned that there was a substantial risk that Sisson had serious medical needs that were not being met.  Despite such knowledge, the Foregoing Defendants failed to reasonably respond.

185.    The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

186.    As a direct and proximate result of the Foregoing Defendants' conduct, Plaintiff was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights in violation of the Eighth Amendment to the U.S. Constitution and actionable under 42 U.S.C. §1983.

187.    As a direct and proximate result of the Foregoing Defendants' conduct, Plaintiff suffered severe and permanent injuries.

188.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Plaintiff's rights, by reason of which Plaintiff is entitled to recover punitive damages.

189.    The Foregoing Defendants' violations of the Eighth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs.

**COUNT FOUR -- DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983**
**(Deliberate Indifference – Supervisory Liability - Against Defendants**
**Davis, Teklu, and Smith)**

190.    Plaintiff incorporates paragraphs 1 through 189 of the Complaint, as if fully set forth herein.

191.    Through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants Davis, Teklu, and Smith (collectively referred to *in this Count* as "the Foregoing Defendants"), acted in a manner that was deliberately indifferent to Plaintiff's Eighth Amendment rights.

192.    The Foregoing Defendants had actual knowledge that their subordinates, including, but not limited to, individual Defendants in this matter, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff.

193.    The Foregoing Defendants had knowledge that, just like they themselves, their subordinates were preventing inmates like Sisson with serious medical conditions from having access to and receiving proper medical care by, among other things as described herein: the multiple other deaths and injuries from preventable conditions that have occurred at the Jail, both before and during Mediko's tenure; the multiple state and federal investigations of the Jail; the plethora of other complaints and lawsuits describing severe medical conditions that were being ignored at the Jail; and the manifold monitoring and reporting obligations imposed upon the Jail pursuant to its Consent Decree with DOJ.

63

194.    The Foregoing Defendants' response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices. Time and time again, the Foregoing Defendants failed to act on their knowledge, failed to carry out *their own obligations* to properly to supervise their subordinates and/or intervene on Sisson's behalf, and failed to provide Sisson with access to appropriate, timely medical care.

195.    There was an affirmative causal link between the Foregoing Defendants' inaction and the particular constitutional injury suffered by Sisson.  Specifically, as a result of the Foregoing Defendants' unconstitutional, deliberate indifference to the needs, circumstances, and requirements regarding medical care of the Jail's inmates, including Sisson, Sisson died unnecessarily.  Sisson thereby suffered a denial of his constitutional rights.  The Foregoing Defendants' unconstitutional, deliberate indifference to Sisson's circumstances caused his death.

196.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Sisson's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

197.    The Foregoing Defendants' violations of the Eighth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs.

### COUNT FIVE -- DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983
**(Official Custom, Policy, Pattern and/or Practice Claim – Against Defendants PRJA, Mediko, Inc., and Mediko, P.C., and, in their official capacities, Davis, Teklu, and Smith)**

198.    Plaintiff incorporates paragraphs 1 through 197 of the Complaint, as if fully set forth herein.

199.    This Count is brought against Defendants PRJA, Mediko, Inc., and Mediko, P.C., and their policy makers in their official capacities – Davis, Teklu, and Smith, for violations of the

Eighth Amendment to the United States Constitution, actionable under 42 U.S.C. §§ 1983 and 1988.

200.    During the relevant time period, through their actions and inactions as set forth above, Defendants PRJA, Mediko, Inc., and Mediko, P.C., acting under color of state law, pursuant to an official custom, policy, pattern and/or practice, operated the provision of healthcare services at the Jail in a manner that posed a substantial risk to the health and safety of the inmates, including Sisson, in that PRJA, Mediko, Inc., and Mediko, P.C. failed to provide, and/or provide access to, reasonable and adequate medical care to inmates and detainees.

201.    As set forth in detail herein, the policy or custom was manifest in certain affirmative decisions and omissions by the policy makers for PRJA, Mediko, Inc., and Mediko, P.C. alleged in Counts Four and Five, as well as by a persistent and widespread practice of deliberate indifference to the health care needs of the inmates sufficient to constitute an official custom. The custom, policy, pattern and/or practice is established by, among other acts, Defendants PRJA, Mediko, Inc., and Mediko, P.C.'s failure to act -- whether through appropriate training, discipline, supervision or other intervention -- in the face of a known pattern of constitutional deprivations that had occurred within the Jail. Such failure was patently likely to cause (and, in the case of Plaintiff, did cause) constitutional deprivations to the inmates who were confined in the Jail, and to whom the PRJA, Mediko, Inc., and Mediko, P.C. owed affirmative duties of care.

202.    Defendants Davis, Teklu, and Smith, policymakers for PRJA, Mediko, Inc., or Mediko, P.C., and any other policymakers for PRJA, Mediko, Inc., or Mediko, P.C. (collectively referred to *in this Count* as "Policy Makers"), were deliberately indifferent to the rights of inmates to receive, and/or obtain access to, adequate medical care at the Jail. Such deliberate indifference is evidenced by, among other things, as discussed herein:

- the multiple federal investigations by ICE and DOJ during the more than 11 years prior to and including Sisson's incarceration, including after Mediko's involvement at the Jail began;

- a DOJ Findings Letter that noted multiple constitutional violations in the Jail's handling of inmate medical care, ultimately resulting in the filing of a civil action and imposition of a years-long Consent Decree that was in place up to and including the time of Sisson's incarceration;

- ICE's decision to pull its detainees out of the Jail out of fear for their health, safety, and welfare;

- the death of ICE detainee Abdeulaye Sall from a kidney condition which spurred federal scrutiny of the Jail;

- the tragic circumstances surrounding the death of ICE detainee Guido Newbrough, who suffered for five weeks from a treatable staph infection before dying;

- the tragic neglect surrounding the death of Michael Baker, who died within 6 days of arriving at the Jail and whose repeated pleas for medical help were ignored;

- the wrongful death of Thomas Cubbage, who died 5 days after Jail officials were notified that he was coughing up blood, and 3 days after a chest x-ray revealed an abnormality; and

- the common themes underlying the stories of the foregoing persons who suffered significant injury or death at the Jail; and

- that the custom, policy, pattern and/or practice of deliberate indifference toward inmate medical care began at the top with, among others, Davis, who would lie to both federal and state officials about Sisson, and carry through all the way to the bottom to individuals like Jones and Johnson, who would falsify jail and medical records.

66

203. Despite having actual knowledge of the foregoing, the Policy Makers did not take appropriate steps to properly train PRJA, Mediko, Inc., and Mediko, P.C. employees. As a direct and proximate result of Policy Makers' failures, Sisson suffered constitutional injuries and died.

204. Defendants PRJA, Mediko, Inc., and Mediko, P.C. had knowledge of the constitutionally inadequate medical services and access to medical services available to inmates at the Jail, and engaged in an official custom, policy, pattern and/or practice of deliberate indifference towards the inmates at the Jail, in the period prior to and including Sisson's incarceration. Specifically, the Policy Makers perpetuated a medical healthcare system that for years failed to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners were subjected to an unacceptable risk of harm due to delays or lack of treatment; and suffered from systemic problems that often caused the failure to provide an adequate level of care. The Policy Makers propagated a culture of neglect and indifference to inmate serious medical needs that allowed unnecessary injuries and deaths to occur; among other things, medical providers utterly failed to communicate and coordinate care properly among themselves and provide inmates with critically needed care.

205. This official custom, policy, pattern and/or practice reflected a deliberate indifference to, and resulted in a deprivation of, Sisson's constitutional rights under the Eighth Amendment, and, such custom, policy, pattern and/or practice caused, or contributed to cause, Sisson's death. As stated herein, Defendant PRJA, Mediko, Inc., and Mediko, P.C.'s policies and customs were directly related to, and the moving force behind, the violation of Sisson's constitutional rights by, among other acts, those of Policy Makers and their employees and agents. As a result, Sisson suffered a denial of his constitutional rights and died.

206.     Defendants' violations of the Eighth Amendment to the United States Constitution establish causes of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages in an amount to be established at trial, and attorney's fees and costs.

WHEREFORE, FOR THE FORGOING REASONS, Victoria Lynn Sisson, Administrator of the Estate of Jason Patrick Sisson, Deceased, by counsel, prays for and demands judgment against Defendants Piedmont Regional Jail Authority, James H. Davis, Amy Baker a/k/a Amy Reid, Nathaniel C. Jones, Jr., David Hicks, Mediko, Inc., Mediko, P.C, Abraham Teklu, M.D., Elizabeth A. Smith, and Kaskha N. Johnson, jointly and severally, as follows:

(1)     Compensatory damages in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000), plus pre-judgment interest from August 21, 2017, and post-judgment interest;

(2)     Punitive damages in the amount of THREE MILLION DOLLARS ($3,000,000), plus pre-judgment interest from August 21, 2017, and post-judgment interest;

(3)     An award for attorneys' fees and costs herein expended as authorized by 42 U.S.C. § 1988; and

(4)     Such other legal and equitable remedies as may be allowed by law.

TRIAL BY JURY IS DEMANDED.

DATED:  August 19, 2019.

> VICTORIA LYNN SISSON, Administrator
> of the Estate of JASON PATRICK SISSON,
> Deceased
>
> By: / s / Mark Dennis Dix
>       Counsel

68

Mark D. Dix (VSB No. 42718)
Seth R. Carroll (VSB No. 74745)
Connor Bleakley (VSB No. 92113)
COMMONWEALTH LAW GROUP, P.L.L.C.
3311 West Broad Street
Richmond, Virginia 23230
Tel.: (804) 999-9999
Fax: (866) 238-6415
Email: mdix@hurtinva.com
Email: scarroll@hurtinva.com
Email: bleakley@hurtinva.com

and

Peter C. Burnett (VSB No. 17222)
Donald S. Culkin (VSB No. 30140)
Seth R. Lindberg (VSB No. 80620)
Matthew E. Bass (VSB No. 83631)
BURNETT & WILLIAMS, P.C.
105 Loudoun Street, S.E.
Leesburg, Virginia 20175
Tel.: (703) 777-1650
Fax: (703) 777-9833
Email: peterb@burnettwilliams.com
Email: dculkin@burnettwilliams.com
Email: srlindberg@burnettwilliams.com
Email: mbass@burnettwilliams.com

*Counsel for Plaintiff*

69